COURT OF APPEALS
DECISION
DATED AND FILED

July 29, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2429**

Cir. Ct. No. 2023CV3152

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

ABBOTSFORD EDUCATION ASSOCIATION, AFSCME, LOCAL 47, AFSCME, LOCAL 1215, BEN GRUBER, BEAVER DAM EDUCATION ASSOCIATION, MATTHEW ZIEBARTH, SEIU WISCONSIN, TEACHING ASSISTANTS' ASSN., LOCAL 3220, AFT AND INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 695,

    PLAINTIFFS-RESPONDENTS,

  V.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION, JAMES J. DALEY, DEPARTMENT OF ADMINISTRATION, KATHY BLUMENFELD, DIVISION OF PERSONNEL MANAGEMENT AND JEN FLOGEL,

    DEFENDANTS-CO-APPELLANTS,

WISCONSIN STATE LEGISLATURE,

    INTERVENOR-DEFENDANT-APPELLANT,

KRISTI KOSCHKEE,

    INTERVENOR-APPELLANT.

---

APPEAL from a judgment of the circuit court for Dane County: JACOB B. FROST, Judge. *Reversed and cause remanded with directions*.

Before Neubauer, P.J., Gundrum, and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. This is an appeal from the circuit court's declaratory judgment that held certain provisions of 2011 Wis. Act 10 ("Act 10") and 2015 Wis. Act 55 ("Act 55") unconstitutional and then struck those provisions.[1] The declaratory judgment followed the court's earlier rulings holding that allowing certain public safety employees[2] to retain collective bargaining rights, without including *all* state public safety employees in that group, violated the equal protection guarantees of article I, section 1 of the Wisconsin Constitution.

¶2 The Appellants challenge the circuit court's declaratory judgment order on various grounds. While we will summarize their respective arguments in greater detail below, their arguments generally fall into the following categories:

---

[1] The declaratory judgment struck down the following provisions of Act 10 and Act 55:

> 2011 Wis. Act 10 §§ 58, 95, 168-169, 178, 182, 210-227, 230-248, 250-262, 264-265, 267-268, 270-273, 276, 278, 283-286, 288-290, 293-296, 298-299, 303, 305-306, 308-312, 314-315, 319-322, 324-334, 366, 387-388; and 2015 Wis. Act 55 §§ 3138g, 3161r, 3162t-v.

[2] The Legislature asserts in its appellate briefing that "the [c]ircuit [c]ourt's reasoning, even if it were correct … at most implicates" state employees rather than municipal employees. References to general and public safety employees, however, refers to those employees more broadly across both categories.

2

(1) Act 10 is constitutional because a rational basis exists for narrowly defining which public safety employees fall within the definition of the public safety employee group and which public safety employees do not;[3] (2) the remedy was overbroad because although the alleged equal protection violation applied only to state employees under the State Employment Labor Relations Act ("SELRA"), the court also struck Act 10 provisions applying to municipal employees covered under the Municipal Employment Relations Act ("MERA"); (3) the court erred in striking portions of Act 55, which modified portions of Act 10, because it was not challenged in the lawsuit; (4) the court erred in failing to consider other laws modifying Act 10 since its inception; and (5) the doctrine of laches should bar the relief sought given the eleven-year delay in bringing this lawsuit.

¶3    Our review on appeal does not begin with a blank slate. Rather, we are guided and/or bound by *Madison Teachers, Inc. v. Walker*, 2014 WI 99, 358 Wis. 2d 1, 851 N.W.2d 337 (*Madison Teachers*), and *Wisconsin Education Ass'n Council v. Walker,* 705 F.3d 640 (7th Cir. 2013) (*WEAC*), which rejected both similar (*Madison Teachers*) and nearly identical (*WEAC*) equal protection challenges to Act 10. For the following reasons, we conclude the challenged Act 10 provisions do not violate the equal protection guarantees set forth in the Wisconsin Constitution,[4] and, accordingly, there was no basis upon which the

---

[3] It is undisputed that no constitutional challenge to Act 10 could be meritorious if the legislation did *not* carve out a public safety exception. It is also undisputed that both federal and state courts have rejected prior challenges to Act 10's constitutionality. *See Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640 (7th Cir. 2013); *Madison Teachers, Inc. v. Walker*, 2014 WI 99, 358 Wis. 2d 1, 851 N.W.2d 337.

[4] Because we resolve this case on the merits, it is not necessary to address the remedy issues. *See, e.g.*, *State v. Lickes*, 2021 WI 60, ¶33 n.10, 397 Wis. 2d 586, 960 N.W.2d 855 ("Issues that are not dispositive need not be addressed." (quoted source omitted)); *Martinez v. Rullman*, 2023 WI App 30, ¶5, 408 Wis. 2d 503, 992 N.W.2d 853 (stating that this court decides cases on the narrowest possible grounds).

circuit court could strike any portion of Act 10 or Act 55. We therefore reverse the circuit court's declaratory judgment and remand with instructions to vacate both the order granting Respondents' motion for judgment on the pleadings and the order denying Appellants' motion to dismiss. The circuit court is directed to enter judgment dismissing this action.

## I. BACKGROUND

¶4 The facts surrounding Act 10's enactment are set forth in both *Madison Teachers* and *WEAC* and need not be repeated here. We list only the facts necessary for resolution of this case. Act 10 modified the collective bargaining rights set forth in the statutes for both municipal employees under MERA, WIS. STAT. §§ 111.70-111.77 (2023-24),[5] and state employees under SELRA, WIS. STAT. §§ 111.81-111.94.

¶5 In November 2023, Respondents Abbotsford Education Association; AFSCME, Local 47; AFSCME, Local 1215; Ben Gruber; the Beaver Dam Education Association; Matthew Ziebarth; SEIU Wisconsin; Wayne Rasmussen; the Teaching Assistants' Association, Local 3220, AFT; and the International Brotherhood of Teamsters Local No. 695 (collectively "the Unions") filed a lawsuit alleging Act 10 was unconstitutional under article 1, section 1 of the Wisconsin Constitution. The Wisconsin State Legislature (Legislature) intervened, and Co-Appellants—the Wisconsin Employment Relations Commission (WERC), James J. Daley, the Department of Administration, Kathy Blumenfeld, the Division of Personnel Management, and Jen Flogel (collectively,

---

[5] All references to the Wisconsin Statutes are to the 2023-24 version.

the State) filed a motion to dismiss, alleging that because there is a rational basis for Act 10's distinction between those public safety employees who fall within the public safety group definition and those that do not, the Unions' Complaint fails to state a claim upon which relief can be granted. The Legislature also filed a motion to dismiss, asserting, inter alia, that the doctrines of claim preclusion and laches bar the lawsuit. Specifically, the Legislature argued that our supreme court in *Madison Teachers* and the Seventh Circuit in *WEAC* resolved the constitutional challenge set forth here and that the Unions therefore should not be allowed to bring claims now that could have been raised in those earlier lawsuits. Regarding laches, the Legislature asserts the 13-year time lapse since Act 10 took effect renders this lawsuit too late such that it must be dismissed without resolving the merits due to the unfair prejudice caused by the delay.

¶6     The circuit court denied the motions to dismiss. It said claim preclusion does not apply because *WEAC* was decided based on equal protection under the United States Constitution rather than the Wisconsin Constitution, that *WEAC* was not a binding precedent, and that the Seventh Circuit did not apply the five-factor test that is sometimes applied in analyzing equal protection challenges in Wisconsin. It also found lack of privity of parties because some plaintiffs in the instant case differed from those in the *WEAC* case.

¶7     With respect to *Madison Teachers*, the circuit court acknowledged that that case *did* involve a challenge based on equal protection under the Wisconsin Constitution and that the Wisconsin Supreme Court "found that the different treatment of represented and non-represented general employees rationally advanced the State's interest in reducing public expenditures." It also conceded that the *Madison Teachers* court held "that some different treatment of certain employees can survive an equal protection challenge." Nevertheless, the

5

court ruled *Madison Teachers* was not binding because that case did not address the classification distinctions raised in the instant case and because it did not have privity of parties.[6]

¶8 Regarding laches, the circuit court found no prejudice for the delay in bringing suit and ruled that because this case involved a substantive, rather than procedural, constitutional challenge, it would not apply laches.

¶9 In concluding no rational basis existed to support Act 10's distinction between those public safety employees that fell within the public safety employee group and those that did not, the circuit court explained:

> The Court can come up with no rational basis for excluding some police and fire employees from the public safety group while including all others and motor vehicle inspectors.

---

[6] It appears from our review of the briefs in *Madison Teachers* that the unions in *Madison Teachers* may not have asserted the same equal protection challenge the Unions raise here because that claim was already before the Seventh Circuit, which ultimately rejected that claim. *See WEAC*, 705 F.3d at 642. And, because the equal protection guarantees under the state and federal constitutions are the same, there presumably was no reason to raise the same equal protection argument under the Wisconsin Constitution already raised under the United States Constitution. *See, e.g.*, *Aicher ex rel. LaBarge v. Wisconsin Patients Comp. Fund*, 2000 WI 98, ¶55 n.14, 237 Wis. 2d 99, 613 N.W.2d 849 ("We apply the same interpretation to the equal protection provisions of both the Wisconsin Constitution and the federal constitution."); *Tomczak v. Bailey*, 218 Wis. 2d 245, 261, 578 N.W.2d 166 (1998). Moreover, one of the briefs in *Madison Teachers* indicates the plaintiffs there conceded that the Seventh Circuit's decision resolved that particular equal protection challenge:

> In the face of this heavy burden, the challengers have conceded that the MERA provisions at issue would survive a rational basis review. This concession should come as no surprise. As explained above, the Seventh Circuit upheld Act 10 under rational basis review.

Brief and Appendix for Defendants-Appellants at 39 (July 25, 2013), *Madison Teachers*, 358 Wis. 2d 1, 2013 WL 3895119, at *39 (internal citation omitted).

> To be clear, I reject Plaintiffs arguments that there is no rational basis for creating any general employee category. A rational basis exists for the distinction between most of the general employee group versus the public safety group. The equal protection defect lies in the selective exclusion of certain employees that should be, but inexplicably are not, in the public safety group.

The court emphasized that there was a rational basis for creating the general employee category and the public safety category:

> As noted in [**Madison Teachers**], the overall purpose of Act 10 was to create budget flexibility for public employers. The purpose of separating out the public safety group and maintaining their collective bargaining rights virtually unchanged was to preserve labor peace among employees deemed too vital to risk labor unrest with. There are rational reasons to want to maintain additional benefits for police officers or fire fighters, as their jobs are highly dangerous and the need for recruiting and maintaining quality employees in these categories is significant and unique from many other, less or non-dangerous public positions.

It further explained that with the exception of motor vehicle inspectors, it was easy to identify a reason as to why the Legislature created the public safety classification—namely, it "reflect[s] a policy of exempting law enforcement, fire suppression or prevention and emergency services employees from Act 10's collective bargaining changes." The court thought this was reasonable because:

> The loss of these employees' services even for a day could result in death, destruction and crime going unchecked. This risk makes these employees different from most other positions placed in the general employee category. For example, if teachers, administration, or sanitation workers face labor unrest and their work goes unperformed for a day or a week, the chances of their absence from work causing death or great harm is small or nonexistent. Another reason to treat this group of emergency service employees different is to offer them additional benefits to attract quality employees, and retain those currently employed, to fill th[ese] jobs that are both important to the public safety but also jobs that involve putting yourself in harms way.

¶10     Despite these conclusions, however, the circuit court determined the Legislature's decision as to which public safety employees to include in the public safety group and which to exclude from that group did not make sense because there were other public safety employees it believed should also fall into the public safety group for Act 10's purposes—for example, Capitol Police, university police, prison correctional officers, and conservation wardens, all of which had been excluded from the public safety group and had instead been placed in the general employee group.  It was on this basis—that Act 10 "does not explain why the other employees who meet those same criteria are excluded from this public safety employee category"—that the court concluded Act 10 lacked a rational basis and was therefore unconstitutional.

¶11     Subsequently, the circuit court entertained how the case should proceed after it denied the motions to dismiss and declared Act 10 unconstitutional.  The Unions moved for judgment on the pleadings, and the State and the Legislature filed briefs opposing the motion.  The parties' respective briefs, per the court's instructions, addressed which of Act 10's provisions they believed should be struck in light of the court's conclusion that Act 10 was unconstitutional.  The court thereafter issued a written order granting judgment on the pleadings, and in December 2024, it entered a declaratory judgment holding numerous provisions of Act 10 and Act 55 unconstitutional and striking various provisions as set forth in its order.  The State, the Legislature, and Kristi Koschkee appeal.

## II.  STANDARD OF REVIEW

¶12     The issue in this case is whether certain Act 10 provisions violate the equal protection guarantees under article I, section 1 of the Wisconsin

Constitution.[7]  Our review on a constitutional challenge presents a question of law we review de novo.  ***Gabler v. Crime Victims Rts. Bd.***, 2017 WI 67, ¶26, 376 Wis. 2d 147, 897 N.W.2d 384.  In ***Madison Teachers***, our supreme court reiterated the law governing such review in the context of an equal protection challenge:

> We will uphold a statute against an equal protection challenge if the classification bears a rational relationship to some legitimate government interest.  Notably, this requires no declaration by the State about the law's purpose, nor evidence supporting the law's rationality.  The actual motivations of the enacting governmental body are irrelevant.  Instead, "[i]n evaluating whether a legislative classification rationally advances the legislative objective, 'we are obligated to locate or, in the alternative, construct a rationale that might have influenced the legislative determination.'"

358 Wis. 2d 1, ¶77 (alteration in original; internal citations omitted; citations omitted).  "Legislative acts must be upheld when this court can conceive of *any* facts upon which the legislation reasonably could be based."  ***Id.***, ¶82 (emphasis added).  "Governmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized."  ***Lamers Dairy Inc. v. USDA***, 379 F.3d 466, 473 (7th Cir. 2004).

¶13  Because we presume statutes are constitutional, reviewing courts must "'sustain [the] statute against attack if there is any reasonable basis for the exercise of legislative power[,]'" and the party asserting unconstitutionality therefore carries a heavy burden.  *See* ***State v. McManus***, 152 Wis. 2d 113, 129,

---

[7] Article I, section 1 of the Wisconsin Constitution provides: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

447 N.W.2d 654 (1989) (citation omitted). "Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to [its] constitutionality, it must be resolved in favor of constitutionality." *State ex. rel. Hammermill Paper Co. v. La Plante*, 58 Wis. 2d 32, 46, 205 N.W.2d 784 (1973). "Unconstitutionality of the act must be demonstrated beyond a reasonable doubt." *Id.*

¶14    "'A decision to grant or deny declaratory relief falls within the discretion of the circuit court[,]'" and we will not disturb the circuit court's ruling unless it "'erroneously exercised its discretion.'" *Putnam v. Time Warner Cable of Se. Wis., Ltd. P'ship*, 2002 WI 108, ¶40, 255 Wis. 2d 447, 649 N.W.2d 626 (quoting *Milwaukee Dist. Council 48 v. Milwaukee County*, 2001 WI 65, ¶36, 244 Wis. 2d 333, 627 N.W.2d 866); *see also* *Olson v. Town of Cottage Grove*, 2008 WI 51, ¶35, 309 Wis. 2d 365, 749 N.W.2d 211.  We will uphold a circuit court's discretionary act so long as it "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Milwaukee Dist. Council 48*, 244 Wis. 2d 333, ¶36 (quoted source omitted); *Olson*, 309 Wis. 2d 365, ¶35.

## III.  DISCUSSION

¶15    We begin by briefly summarizing the parties' respective arguments on appeal followed by a review of *WEAC* and *Madison Teachers*, both of which guide our analysis regarding the question of whether Act 10's challenged provisions survive the equal protection challenge raised under the Wisconsin Constitution in this matter.

*A. The Parties' Arguments*

¶16    The State raises multiple issues challenging the circuit court's declaratory judgment decision and asserts the court erred in: (1) denying its motion to dismiss the declaratory judgment action; (2) failing to account for subsequent legislative changes in both Act 55—which was not challenged in this lawsuit—and in other statutes enacted during the eleven-plus years that Act 10 has been the law; and (3) creating inconsistent treatment and negative outcomes for municipalities.  It contends that if Act 10 is upheld as unconstitutional, the proper remedy is to look at existing law—including the numerous revisions to the relevant statutes over the last decade—rather than simply striking specific Act 10 statutory provisions in an attempt to restore Wisconsin law to what it was before Act 10.

¶17    Two parties participating as Intervenors also appeal: the Legislature and Koschkee, a public-school teacher who wants to retain her Act 10 protections.[8]   While the State largely (though not only) argues the circuit court erred as to its remedy, the Legislature focuses much of its argument on its belief that the court erred in holding Act 10 unconstitutional because, it says, there is a rational basis for the state public safety employees belonging to the public safety group being treated differently than those public safety employees *not* included in that group.   The Legislature also argues the remedy ordered was overbroad because the alleged equal protection violation applied solely to state employees, not municipal employees, as well as that the doctrine of laches should bar relief

---

[8] The circuit court granted the Legislature's motion to intervene.  Koschkee also sought to intervene while this matter was pending before the circuit court; however, the court denied her motion.  Koschkee thereafter sought to intervene on appeal, and we granted that motion.

given the eleven-year delay in bringing this lawsuit. Koschkee's arguments largely mirror the Legislature's.[9]

¶18 The Unions defend the circuit court's ruling.[10] They assert: (1) there is no rational basis to justify allowing the public safety employees to retain pre-Act 10 collective bargaining rights; (2) *Metropolitan Associates v. City of Milwaukee*, 2011 WI 20, 332 Wis. 2d 85, 796 N.W.2d 717, mandates the remedy ordered; (3) any remedy argument based on failure to account for statutory changes impacting Act 10 during the eleven years between enactment and this suit has been forfeited; and (4) the doctrine of laches cannot bar this lawsuit because it is a challenge to *substantive* rather then *procedural* constitutional violations.

¶19 We also received amicus briefs from The Buckeye Institute, The League of Wisconsin Municipalities (the "League"), the Wisconsin Manufacturers and Commerce Inc. ("WMC"), the National Right to Work Legal Defense Foundation, Inc. ("Right to Work"), and a joint brief from Professor Joseph E. Slater from the University of Toledo College of Law and Professor Anne Marie Lofaso from the University of Cincinnati College of Law. Of these five amicus briefs, only one—that of Professor Slater and Professor Lofaso—argues that the circuit court did not err in declaring Act 10's challenged provisions

---

[9] Koschkee also asserts that the circuit court's order implicates her First Amendment rights because in striking certain of Act 10's provisions, the court's "remedy violates [her] First Amendment right not to associate with or support union activities." Because we conclude the circuit court erred, we need not address this argument further. *See, e.g.*, *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("[A]ppellate court[s] should decide cases on the narrowest possible grounds.").

[10] The Respondents on appeal (who were the plaintiffs in the circuit court) consist of seven unions and two individuals, one of whom is a president of one of the unions (Gruber) and one of whom is a teacher (Ziebarth). In an order dated August 19, 2024, the circuit court dismissed Wayne Rasmussen, who was initially listed as a Plaintiff, without prejudice.

unconstitutional and that this court should therefore affirm. Generally speaking, the Buckeye Institute, the League, and WMC focus their respective arguments on fiscal matters related to Act 10's imposition and the impact Act 10 has had on Wisconsin's fiscal standing since its inception.[11] Right to Work, by contrast, primarily identifies laws supporting the proposition that there is no constitutional

---

[11] For example, in providing context at the time of Act 10's enactment, the Buckeye Institute explains that Act 10 sought to solve Wisconsin's "'$3.6 billion budget shortfall,'" prevented the need to layoff "'12,000 state and local public employees,'" and "'saved Wisconsin taxpayers between $18 billion and $31 billion since 2012[.]'" (Citations omitted.) As such, the Buckeye Institute advocates for reversal of the circuit court's decision because both the federal and state constitutions assign fiscal policy decisions to the legislative branch to which the courts must defer. *See, e.g.*, U.S. CONST. art. I, § 9, cl. 7; WIS. CONST. art. VIII, § 2.

The League provided similar context, advising that Act 10's enactment followed a recession and many other unsuccessful attempts to address Wisconsin's $6 billion deficit—including cuts to all state programs, requiring state employees to take eight unpaid furlough days a year, cuts to school aid, and rolling back the 2% pay increase. It also explains that 2011 Wis. Act 32, companion legislation to Act 10, made large cuts to the shared revenue amounts sent to municipalities and that Act 10 offset those cuts by allowing municipalities to reduce their labor costs to balance municipal budgets. To that end, the League expresses concern about the fiscal impact to municipalities arising from the circuit court's decision, particularly since the court struck "parts of Act 10 without addressing the subsequent enactments that affected the same provisions."

The WMC also focuses on Act 10's financial impact, asserting that Act 10 "saved Wisconsin from financial ruin" and protected State employees from losing their jobs. WMC is concerned the circuit court's decision will return Wisconsin to a state of fiscal crisis and cause municipalities to increase taxes or lay off employees and force school districts to "increase taxes or sacrifice education."

13

right to collective bargaining.[12]   Finally, Professors Slater and Lofaso advise "there is no causal link between collective bargaining rights and fiscal instability[,]" attribute Wisconsin's fiscal crisis to the recession rather than collective bargaining, and contend Act 10 damaged public service because it caused a reduction in pay and an increase in turnover rates.  (Formatting altered.)

### B.  *WEAC* and *Madison Teachers*

¶20     Turning to the issue presented on appeal, we emphasize again that we do not start from scratch in reviewing this constitutional challenge.  Shortly after Act 10's enactment, various parties pursued constitutional challenges in both state and federal courts.  The state challenge came before the Wisconsin Supreme Court in *Madison Teachers*, which resolved multiple Act 10 challenges and ultimately held Act 10 constitutional, *see Madison Teachers*, 358 Wis. 2d 1, ¶¶159-164, and the federal challenge, which was nearly identical to the one raised here, came before the Seventh Circuit in *WEAC*.

---

[12] In support of its position, Right to Work points to cases it says confirm there is a rational basis upon which to distinguish the public safety group from the general employee group. Generally speaking, the cases Right to Work cites stand for the proposition that there is no constitutional right to collective bargaining, *see, e.g.*, *Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463 (1979), and that the Wisconsin Supreme Court has repeatedly held that the equal protection clauses in both the state and federal constitutions provide identical protections, *see, e.g.*, *A.M.B. v. Circuit Court for Ashland County*, 2024 WI 18, ¶11 n.6, 411 Wis. 2d 389, 5 N.W.3d 238; *Blake v. Jossart*, 2016 WI 57, ¶28, 370 Wis. 2d 1, 884 N.W.2d 484 ("As a general principle, this court treats these provisions of the United States and Wisconsin Constitutions as consistent with each other in their due process and equal protection guarantees."); *Mayo v. Wisconsin Injured Patients & Fams. Comp. Fund*, 2018 WI 78, ¶35, 383 Wis. 2d 1, 914 N.W.2d 678 (recognizing that article I, section 1 of the Wisconsin Constitution provides the *same* equal protection rights as the United States Constitution); *GTE Sprint Commc'ns Corp. v. Wisconsin Bell, Inc.*, 155 Wis. 2d 184, 193, 454 N.W.2d 797 (1990) (stating that Wisconsin's Equal Protection clause has been "interpreted to afford substantially the same protections as its federal counterpart."); *Jackson v. Benson*, 218 Wis. 2d 835, 900 n.28, 578 N.W.2d 602 (1998); *State ex rel. Sonneborn v. Sylvester*, 26 Wis. 2d 43, 50, 132 N.W.2d 249 (1965) (recognizing "there is no substantial difference between the two constitutions").

*1. __WEAC__*

¶21    Following Act 10's enactment, several Wisconsin public unions unsuccessfully challenged Act 10's constitutionality in federal court, alleging three of Act 10's provisions—"the limitations on collective bargaining, the recertification requirements, and a prohibition on payroll deduction of dues"— violated the federal Equal Protection Clause.  *WEAC*, 705 F.3d at 642.  In applying rational basis review, the Seventh Circuit rejected each of the equal protection arguments and upheld the challenged provisions.  *Id.* at 653.

¶22    In reviewing the challenges asserted, the Seventh Circuit began by rejecting the argument that the payroll deduction violated the First Amendment. *Id.* at 645.  It did so because the deduction did not burden speech, it was viewpoint neutral, and there was no "invidious discrimination."  *Id.* at 645-53.  Concluding there were no First Amendment concerns, it turned to the equal protection challenge and concluded the challenged provisions survive rational basis review. *Id.* at 653.

¶23    In regard to the limitations placed on collective bargaining, the Seventh Circuit acknowledged that such "limitations constitutionally promote flexibility in state and local government budgets by providing public employers more leverage in negotiations"; however, it also confirmed that the differing treatment between the public safety group and the general group must nevertheless be rational to survive the equal protection challenge. *Id.* at 654-55.  Agreeing with the district court, the Seventh Circuit concluded there was a rational basis for providing different collective bargaining rights to each of the two groups because the state "reasonably concluded that the public safety employees filled too critical a role to risk" a work stoppage in the face of "unrest with respect to public safety

employees." *Id.* at 655. Confirming that "Wisconsin was free to determine that the costs of potential labor unrest exceeded the benefits of restricting the public safety unions[,]" the *WEAC* court noted that such a "conclusion is uncontroversial" and that "other courts have upheld distinctions between employee groups with similar classifications." *Id.* While it "may have been a poor choice," the Seventh Circuit said, it was not an unconstitutional one. *Id.* at 656.

¶24 The *WEAC* court reached a similar conclusion as to Act 10's recertification requirements, stating that "[m]any of the justifications for the collective bargaining limitation also apply to the recertification requirement." *See id.* It explained that "Act 10 exhibits a rational belief that public sector unions are too costly for the state[,]" and "[b]ecause the state clearly has an interest in the recertification requirement, the rational basis for applying it only to general employees flows from the justification for differentially applying the collective bargaining limits." *Id.* at 656-57. In other words, according to the Seventh Circuit, the fear of backlash from the public safety group was sufficient to serve as a rational basis for imposing different recertification requirements on the two groups. *See id.* at 657. The Seventh Circuit relied on this same rationale in upholding the payroll deduction prohibition, stating the "differential treatment of [the] general and public safety unions is supported by [the state's] concern for labor peace among the public safety employees." *Id.*

¶25 In rejecting the public unions' arguments, the Seventh Circuit, which did not appear to view the equal protection challenge as a close question, made multiple observations relevant to our conclusion here. First, the *WEAC* court acknowledged the public unions' argument that there is no reason to classify "state motor vehicle inspectors as public safety employees" but not "prison guards, the

University of Wisconsin Police, and the Capitol Police" and noted their argument that "the distinctions between the[se] two classes are 'so disconnected' from a proffered purpose and 'so closely connected' to an illegitimate purpose." *Id.* at 653. Nevertheless, it said, this distinction alone did not render Act 10 unconstitutional because courts are not to "speculate" about classifications or the "legislature's motive." *Id.* (citing *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (stating that courts are prohibited from "strik[ing] down an otherwise constitutional statute on the basis of an alleged illicit legislative motive")).

¶26    The Seventh Circuit, relying on several United States Supreme Court cases, also explained it was reasonable to create the public safety employee class because "the public safety employees filled too critical a role to risk" a work "stoppage" by those employees. *WEAC*, 705 F.3d at 655 (citing *Ellis v. Brotherhood of Ry. Clerks*, 466 U.S. 435, 455-56 (1984); *Knox v. Service Emps. Int'l Union, Local 1000*, 567 U.S. 298, 311 (2012)). And, it said, the Legislature's rationale for distinguishing between the two groups proved true when, after Act 10's enactment, "thousands descended on the state capital in protest and numerous teachers organized a sick-out through their unions, forcing schools to close, while the state avoided the large societal cost of immediate labor unrest among public safety employees." *WEAC*, 705 F.3d at 655. The *WEAC* court did not stop there, however, as it cited multiple United States Supreme Court cases it said further supported its decision:

- *FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993), for the proposition that the United States Supreme Court "has continually rejected" the claim that leaving similar groups out of the favored classification violates equal protection because "'some persons who have an almost equally strong claim to favored treatment'" "'is a matter for legislative, rather than

17

judicial consideration.'" ***WEAC***, 705 F.3d at 655 (quoting ***Beach Commc'ns, Inc.***, 508 U.S. at 315-16).

- ***Village of Belle Terre v. Boraas***, 416 U.S. 1 (1974), where the Court rejected a challenge over legislative line drawing and "refused to invalidate" a law "because 'every line drawn by a legislature leaves some out that might well have been included.'" *WEAC*, 705 F.3d at 655 (quoting ***Village of Belle Terre***, 416 U.S. at 8).

- ***Vance v. Bradley***, 440 U.S. 93 (1979), in which the Seventh Circuit pointed out that the Court held a "statute easily withstood rational basis review" despite being overinclusive to some and underinclusive to others "because 'perfection is by no means required' and the 'provision does not offend the Constitution simply because the classification is not made with mathematical nicety.'" ***WEAC***, 705 F.3d at 655-56 (quoting ***Vance***, 440 U.S. at 108).

- ***City of New Orleans v. Dukes***, 427 U.S. 297 (1976) (per curiam), where the Court concluded a rational basis existed for "upholding the preferential treatment" for experienced pushcart vendors over those less experienced despite the absence of any proof of qualifications. ***WEAC***, 705 F.3d at 656 (quoting ***Dukes***, 427 U.S. at 298).

- ***Williamson v. Lee Optical of Oklahoma, Inc.***, 348 U.S. 486 (1955), in which the Court upheld a law "allowing only ophthalmologists and optometrists to install prescription eye lenses, even though opticians possessed similar skills." ***WEAC***, 705 F.3d at 656 (citing ***Williamson***, 348 U.S. at 486, 490-91).

And, in a footnote, the Seventh Circuit specifically acknowledged that correctional officers (prison guards) may have been left out of the public safety employee group because they are also excluded under the trust fund statute, which decision is supported by ***McDonald v. Board of Election Commissioners***, 394 U.S. 802 (1969), holding that "a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to

cover every evil that might conceivably have been attacked." *WEAC*, 705 F.3d at 656 n.11 (quoting *McDonald*, 394 U.S. at 809).

¶27 The *WEAC* court concluded its analysis by explaining that it is the Legislature's role, not the court's, to determine public safety classifications and that even if it thought Capitol Police rather than motor vehicle inspectors should have been in the public safety class, "invalidating the legislation on that ground would elevate the judiciary to the impermissible role of supra-legislature." *WEAC*, 705 F.3d at 656.

### 2. *Madison Teachers*

¶28 Our Wisconsin Supreme Court, like the Seventh Circuit, also rejected multiple constitutional challenges—including an equal protection challenge under the Wisconsin Constitution—to Act 10's provisions. *See Madison Teachers*, 358 Wis. 2d 1, ¶¶159-64. Although the equal protection challenge raised in *Madison Teachers* was articulated differently than the challenge raised in the instant case, *Madison Teachers* is nonetheless significant to our resolution of the equal protection challenge presented here because it concluded a rational basis existed for Act 10's enactment and rejected the constitutional challenges asserted at that time. *Madison Teachers*, 358 Wis. 2d 1, ¶3 ("We … uphold Act 10 in its entirety.").[13]

---

[13] In fact, our supreme court's decision espoused a number of legal principles that impact the equal protection issue asserted in the instant case, including:

(continued)

¶29      The ***Madison Teachers*** plaintiffs raised multiple challenges to Act 10's provisions, including for our purposes here, a challenge "that Act 10 violates the plaintiffs' right to equal protection of the laws guaranteed by Article I, Section 1 of the Wisconsin Constitution by impermissibly creating classifications that disadvantage represented general employees based on the exercise of their rights to associate[.]" ***Madison Teachers***, 358 Wis. 2d 1, ¶9.  Stated otherwise, our supreme court was faced with addressing "whether Act 10 impermissibly infringes on the equal protection rights of represented general employees when compared to non-represented general employees[.]" ***Id.***, ¶15.  While ***Madison Teachers*** did not implicate or address the specific distinction between the general employee group and the public safety employee group at issue here but rather two categories of employees within the general employee group, *see* ***id.***, ¶15, the analysis and rationales our supreme court set forth in that case are nevertheless relevant to our review.

¶30      In ***Madison Teachers***, our supreme court first concluded the Act 10 provisions challenged there did "not violate the right to freedom of association

---

(1) "The fact that Act 10 creates two classes of public employees by whether they elect to have a certified representative for collective bargaining purposes denies no employee equal protection under the law.  As the defendants accurately point out, if the plaintiffs were correct in their argument, *any* public sector bargaining framework that resulted in different treatment for represented and non-represented general employees would be unconstitutional.  This means if the plaintiffs' equal protection argument were correct, any collective bargaining scheme would be constitutionally infirm." ***Madison Teachers***, 358 Wis. 2d 1, ¶81; and

(2) "We conclude this classification scheme rationally advances the legislative purpose of improving Wisconsin's fiscal health through enhanced control over public expenditures." ***Id.***, ¶82.

under the First Amendment" and thereafter turned its attention to the question of whether Act 10 "offends the equal protection provisions of the Wisconsin or United States Constitutions." *Madison Teachers*, 358 Wis. 2d 1, ¶74. Answering that question required the court to apply the rational basis review standard, and it ultimately concluded that because the "equal protection argument hinges on the merit of the[] … associational rights claim[,]" which the court had already rejected, the "equal protection claim necessarily fails under rational basis review." *Id.*, ¶75.

¶31 As *Madison Teachers* explained, courts "will uphold a statute against an equal protection challenge if the classification bears a rational relationship to some legitimate government interest[,]" and "this requires no declaration by the State about the law's purpose, nor evidence supporting the law's rationality." *Id.*, ¶77. Moreover, it noted, "[t]he actual motivations of the enacting governmental body are irrelevant[,]" and in determining "'whether a legislative classification rationally advances the legislative objective,'" courts must "'locate or, in the alternative, construct a rationale that might have influenced the legislative determination.'" *Id.* (citation omitted).

¶32 In applying these principles, the *Madison Teachers* court rejected the plaintiffs' two equal protection challenges: (1) that "under Act 10, general employees who choose to associate with a certified representative are limited to negotiating on the sole issue of base wages" whereas "[g]eneral employees who do not associate with a certified representative … face no limitations on what they may negotiate with their employer"; and (2) that "Act 10 prohibits municipal employers from deducting labor organization dues from the paychecks of general employees who choose to associate with a certified representative" whereas "[g]eneral employees that belong to other organizations … face no similar

21

prohibition in having membership dues from those organizations deducted from their paychecks." *Id.*, ¶78.

¶33    Regarding the first challenge, the supreme court rejected plaintiffs' argument and stated that "[t]he fact that Act 10 creates two classes of public employees by whether they elect to have a certified representative for collective bargaining purposes denies no employee equal protection under the law." *Id.*, ¶81. In doing so, the supreme court *acknowledged its agreement with* the Seventh Circuit's analysis in *WEAC* that "Act 10's requirement that base wage increases above the cost of living require a municipal voter referendum for certified bargaining agents 'promote[s] flexibility in state and local government budgets by providing public employers more leverage in negotiations.'"[14] *Madison Teachers*, 358 Wis. 2d 1, ¶82 (quoting *WEAC*, 705 F.3d at 654). Accordingly, the supreme court concluded the challenged "classification scheme rationally advances the *legislative purpose of improving Wisconsin's fiscal health through enhanced control over public expenditures*." *Madison Teachers*, 358 Wis. 2d 1, ¶82 (emphasis added).

¶34    Turning to the second challenge—payroll deduction prohibitions— the supreme court concluded there was no equal protection violation because the "prohibition on deducting labor organization dues could be founded on the … rational belief that labor organizations are costly for the State" and that "[t]he

---

[14] The *Madison Teachers* court made a similar statement in regard to the Seventh Circuit's conclusions regarding the First Amendment challenges: "While the Seventh Circuit's analysis of Act 10 is not binding on this court, we find no reason to disagree with its clear and rational articulation of the law." *Madison Teachers*, 358 Wis. 2d 1, ¶68 (citing *WEAC*, 705 F.3d at 645-46). Our supreme court clearly concluded *WEAC*'s rationale was both compelling and sound.

State has a legitimate interest, especially in the current economic climate, in curtailing costs where possible." *Id.*, ¶85. To that end, it said, the challenged "prohibition on paycheck deductions furthers this interest by imposing a burden that affects the influence of labor organizations over general employees who are less enthusiastic about participating in the collective bargaining process." *Id.* Because the challenged provisions withstood rational basis review, the supreme court rejected the equal protection challenges. *Id.*, ¶161.

### C. The Challenged Provisions Do Not Violate Wisconsin's Equal Protection Clause.

¶35 Turning to the issue presented here—whether Act 10 violates the Equal Protection Clause of the Wisconsin Constitution—we start with the "presumption that all legislative acts are constitutional[.]" *See Madison Teachers*, 358 Wis. 2d 1, ¶76. This presumption "places a heavy burden on a party challenging the statute's constitutionality under rational basis review." *Id.* "The presumption of statutory constitutionality is the product of our recognition that the judiciary is not positioned to make the economic, social, and political decisions that fall within the province of the legislature." *Aicher ex rel. LaBarge v. Wisconsin Patients Comp. Fund*, 2000 WI 98, ¶20, 237 Wis. 2d 99, 613 N.W.2d 849. And, as the *WEAC* court explained, a court's role is not to condemn the legislative branch's motive or to strike the law because it does not agree with the classification: "All that matters is whether the statute, as written, furthers a legitimate government objective. Once we find a 'rational relationship between the disparity of treatment and some legitimate governmental purpose,' the act passes constitutional scrutiny." *WEAC*, 705 F.3d at 653.

¶36 Our supreme court found such a rational relationship—that Act 10 "advance[d] the legislative purpose of improving Wisconsin's fiscal health

23

through enhanced control over public expenditures"—in *Madison Teachers*, and we are bound by that conclusion in considering the issues presented on appeal. *See Madison Teachers*, 358 Wis. 2d 1, ¶82. As our supreme court explained: "The State has a legitimate interest, especially in the current economic climate, in curtailing costs where possible." *Id.*, ¶85. Although the court addressed a slightly different equal protection challenge in that case—one that considered disparities between two groups of general employees rather than the disparities between the public safety group carved out from Act 10 and those with similar public safety roles left in the general employee group—we are nevertheless bound by the general legal principles *Madison Teachers* espouses and cannot simply ignore, as the circuit court did here, that our supreme court identified a rational basis for Act 10.[15] That rational basis does not disappear simply because a party presents a reframed equal protection argument a decade after both our supreme court and the Seventh Circuit unequivocally concluded that Act 10 survives a rational basis review.

¶37     *Madison Teachers*, although addressing a slightly different equal protection challenge, is also instructive as to how we are to view the Seventh Circuit's *WEAC* decision, which *did* address an equal protection challenge almost identical to the one raised here. Specifically, despite acknowledging *Madison Teachers* did not involve the equal protection claim between the general employee group and the public safety group asserted in the present matter, the *Madison Teachers* court acknowledged that the Seventh Circuit had already addressed this

---

[15] We also note that although *Madison Teachers* addressed challenges only to provisions under MERA and not those under SELRA, the supreme court indicated that "any decision on the provisions affecting municipal employees under MERA would appear to be dispositive with respect to state employees under SELRA as well." *Madison Teachers*, 358 Wis. 2d 1, ¶7 n.5.

very equal protection challenge under the United States Constitution in *WEAC* and that it had *conclusively rejected* such a challenge under the federal equal protection clause. *See Madison Teachers*, 358 Wis. 2d 1, ¶4 n.4 ("The United States Court of Appeals for the Seventh Circuit recently held, under a rational basis standard of review, that the public employee classifications created by Act 10 did not violate equal protection." (citing *WEAC*, 705 F.3d at 656)). And, although addressing a slightly different equal protection challenge under the Wisconsin Constitution rather than the United States Constitution, the *Madison Teachers* court voiced its agreement with the Seventh Circuit's equal protection analysis. *Madison Teachers*, 358 Wis. 2d 1, ¶82.

¶38     Like the *Madison Teachers* court, we look to *WEAC* for guidance because while the Seventh Circuit's rejection of an essentially identical equal protection challenge under the federal constitution is not binding on this court in regard to an equal rights challenge under the state constitution, its analysis is compelling—particularly in light of our own supreme court's approval of the Seventh Circuit's analysis in *WEAC* regarding the multiple constitutional challenges to Act 10 raised in that case.[16] *See, e.g.*, *Madison Teachers*, 358 Wis. 2d 1, ¶¶68, 82. Additionally, although the challenge here arises under the Wisconsin Constitution rather than the United States Constitution, that distinction is without difference in light of our supreme court's repeated confirmation that equal protection guarantees under the Wisconsin Constitution are the same as those set forth under the federal constitution—a pronouncement we are bound to follow. *See, e.g.*, *A.M.B. v. Circuit Ct. for Ashland Cnty.*, 2024 WI 18, ¶11 n.6,

---

[16] The Seventh Circuit also rejected claims that Act 10 violated the First Amendment. *WEAC*, 705 F.3d at 645-53.

411 Wis. 2d 389, 5 N.W.3d 238 ("As a general principle, this court treats [the equal protection] provisions of the United States and Wisconsin Constitutions as consistent with each other in their due process and equal protection guarantees." (quoting *Blake v. Jossart*, 2016 WI 57, ¶28, 370 Wis. 2d 1, 884 N.W.2d 484)).

¶39    As noted, the *WEAC* court held that the Legislature had a rational basis for dividing general employees and public safety employees into two groups, and in doing so, it specifically rejected the claim that Act 10's failure to include *all* public safety employees in the group that retain full collective bargaining rights renders Act 10 unconstitutional. *WEAC*, 705 F.3d at 653. Having thoroughly reviewed *WEAC* and its basis for concluding Act 10 is not unconstitutional because there is a rational basis for why some public safety employees were excluded from the general employees group while others were not, we agree with the Seventh Circuit's analysis. To hold otherwise would require that we conclude Act 10, which does not violate the federal constitution on the basis of equal protection, nevertheless violates the Wisconsin Constitution on this exact same basis—a result that would be patently absurd given that the equal protection guarantees under the Wisconsin and United States Constitutions are coextensive.

¶40    Applying these basic concepts to the equal protection challenges raised under the Wisconsin Constitution in this matter, we are satisfied there is undoubtedly a rational basis for Act 10. Everyone, including the circuit court here, agrees there was a rational basis for the Act *itself*—to address the fiscal budget crisis, a point the *Madison Teachers* court made clear. *See Madison Teachers*, 358 Wis. 2d 1, ¶82 ("[T]his classification scheme rationally advances the legislative purpose of improving Wisconsin's fiscal health through enhanced control over public expenditures."). There was also a rational basis for creating the general employee group with a carve out for certain public safety employees to

ensure labor peace and to protect essential services. The only question presented is whether the Legislature's decision to include certain public safety employees in the favored category while excluding similar public safety employees has a rational basis. Like the Seventh Circuit, we conclude both that there is a rational basis for the Legislature's choice and that the law frowns on courts second-guessing such classifications.

¶41 While it may be easy to review the Legislature's decision regarding which public safety employees to include in the public safety group and question why certain public safety employees, such as motor vehicle inspectors, were included in that group while Capitol Police were placed in the general employee group, or why firefighters were included in the public safety group but fire marshals were not, it is not our role to second-guess these classifications. Rather, our role is limited to determining whether *any* rational basis exists for the Legislature's choice. In fact, the law obligates courts "to *locate* or, in the alternative, *construct a rationale* that might" demonstrate a reason for the classification. **Madison Teachers**, 358 Wis. 2d 1, ¶77 (emphases added). We must uphold the law if we "can conceive of *any facts* upon which the legislation reasonably could be based." **Id.**, ¶82 (emphasis added). We may only conclude the law violates equal protection "if *no sound reason* for the action can be *hypothesized*." *See* **Lamers Dairy Inc.**, 379 F.3d at 473 (emphases added).

¶42 This is not a close case. Under these standards, we can easily *locate* a reason for the choices the Legislature made. We can *conceive* of facts for the public safety distinctions, and we can *hypothesize* a *sound reason* for why some public safety employees were not included in Act 10's public safety group. Namely, the groups included in the public safety group were the minimum number of groups the Legislature deemed essential to perform public safety-related

27

services, and it selected employees it determined were necessary to maintain public safety in the event of labor unrest. The fact that the Legislature did not include *all* employees who could be described as providing services related to public safety in the favored collective bargaining category does not render the law irrational. To the contrary, it is logical to conclude that if the Legislature's goal was to restrict collective bargaining privileges for the largest possible number of public employees without also risking essential public safety services, the distinctions it made was in furtherance of this goal.

¶43 The Legislature also explained in its appellate brief that groups that were excluded from the public safety group generally had concurrent jurisdiction with groups that were not excluded. For example, prison guards (correctional officers), who were excluded from the public safety group, are not the only public safety officers with jurisdiction over the prisons—rather, the Legislature explained, the Governor could activate the National Guard to assist with prisons in the event prison guards went on strike. Thus, even if the excluded prison guards engaged in the feared labor unrest, other individuals were capable of standing in. The Legislature explained that the same rationale applied to other public safety employees who were not included in the public safety group—for example, Capitol and university police are not the only officers who could provide such services on campuses and in the Capitol; rather, local police and sheriffs could stand in their place.

¶44 We can likewise conceive of a rationale for including motor vehicle inspectors within the favored public safety group. Namely, these employees have full police authority and serve as part of the Wisconsin State Patrol. *See* WIS. STAT. § 110.07(3). Accordingly, there is a sound reason to include this group, which has a statewide, state-level police force that could be called on to ensure

critical public safety services are not disrupted. The same can be said for the decision to include firefighters in the favored public safety group while excluding fire marshals—firefighters serve "in the trenches" and respond to emergencies and protect lives, *see* WIS. STAT. §§ 40.02(48)(b)2 and 62.13(8), whereas fire marshals serve in a more investigatory capacity, *see* WIS. STAT. § 165.55.

¶45    Finally, we reiterate it is the *Legislature*—not the courts—that is tasked with making the classification choices involved here. The Legislature has the knowledge of the specific services and capacity each state and municipal agency provides and is thus in the best position to determine which of those groups should be included in the public safety group to ensure all critical services will be covered.

¶46    In reaching our conclusion here, we are mindful that our supreme court, in rejecting the equal protection challenge under the Wisconsin Constitution made in *Madison Teachers*, quoted the United States Supreme Court in *McGowan v. Maryland*, 366 U.S. 420 (1961), which instructed:

> [The Equal Protection Clause] permits the States a wide scope of discretion in enacting laws which affect *some groups of citizens differently than others*. The constitutional safeguard is offended *only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective*. State legislatures are presumed to have acted within their constitutional power *despite the fact that, in practice, their laws result in some inequality*. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*Madison Teachers*, 358 Wis. 2d 1, ¶76 (quoting *McGowan*, 366 U.S. at 425-26; alteration in original; emphases added)). Act 10 certainly affected some groups of citizens differently than others, but our supreme court, the Seventh Circuit, and now this court have all concluded there was a rational basis for doing so. The

choice to exempt some public safety employees from the challenged provisions (collective bargaining, recertification requirements, and payroll deductions) was not irrelevant to the achievement of the Legislature's fiscal objective—rather, it was a reasonable way to do so. And time has proven the Legislature's choice to be correct—the public safety employees in the public safety group managed the historic labor unrest that exploded in our state after Act 10 went into effect and the fiscal crisis facing our state at the time of Act 10's enactment has essentially been eliminated. *See WEAC*, 705 F.3d at 655. As the amici point out on appeal here, as a result of Act 10's provisions, state employees have not had to take unpaid furlough days as they did in the past, and the state now has a budget surplus rather than a significant budget deficit.[17]

¶47 As a final matter, we address the Unions' argument that *WEAC* is not persuasive precedent because it did not analyze the equal protection challenges at issue there under *Metropolitan Associates*' five-factor test. They contend that in analyzing whether Act 10 violates equal protection under the Wisconsin Constitution, courts must *always* apply the five-factor test. We disagree. Although that test has been used in some instances, our supreme court did not use it in *Madison Teachers*, and we see no reason to do so here.

---

[17] *See* Institute For Reforming Government, *On The Anniversary of 2011 Wisconsin ACT 10: A Look Back At The Legislation That Gained National Headlines* (Feb. 12, 2020), https://reforminggovernment.org/wp-content/uploads/2020/02/2020-02-10-IRG_Policy-Paper_Act-10_Final1.pdf; William Osmulski, *ACT 10 Savings Top $35 Billion In 2025* (Mar. 17, 2025), https://www.maciverinstitute.com/research/act-10-savings-top-35-billion-in-2025 (last visited May 20, 2026); Wisconsin Department of Employee Trust Funds (ETF), *Annual Comprehensive Financial Report 2023*, https://etf.wi.gov/publications/acfr-2023/download?inline= (last visited May 20, 2026); Wisconsin Department of Employee Trust Funds, *Our Wisconsin Retirement System: Strong for Wisconsin* at 3, https://etf.wi.gov/publications/et7100/direct (last visited May 20, 2026).

¶48    Based on the foregoing, we conclude the circuit court erred in determining *WEAC*'s holding is neither applicable nor persuasive because, as our supreme court has held, the federal constitution's equal protection guarantees are coextensive with our state constitution.  In analyzing equal protection under the Wisconsin Constitution, we may therefore rely on federal law just as our supreme court did in *Madison Teachers*.  Thus, it is of no consequence that *WEAC* involved an equal protection challenge under the United States Constitution because the result is identical under the Wisconsin Constitution.

¶49    To that end, we agree with the *WEAC* court's analysis, as there is a rational basis for Act 10's distinction between those that fall within the public safety group and those within the general employee group as it relates to the specific Act 10 provisions challenged on appeal: resolution of a fiscal crisis by providing state agencies and municipalities with the ability and flexibility to absorb reductions in funding.  Stated otherwise, the rational basis for placing certain public safety employees in the favored group was to place as many public employees in the general employee category as possible to effectuate the intended savings without compromising essential public safety services.  *See Hortonville Educ. Ass'n v. Hortonville Jt. Sch. Dist. No. 1*, 66 Wis. 2d 469, 484-85, 225 N.W.2d 658 (1975) ("It is not difficult to find a rational basis for the legislation. If police or firemen go on strike the imminent and immediate danger to the community is so great that every reasonable measure must be taken to get them back on the job as soon as possible, or to prevent them from striking in the first instance."), *reversed on other grounds*, *Hortonville Jt. Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482 (1976).

## IV. CONCLUSION

¶50 The United States Supreme Court has repeatedly held that in analyzing whether a rational basis exists in an equal protection challenge, courts must exercise judicial restraint and refrain from "'judg[ing] the wisdom, fairness, or logic of legislative choices'" because that is not our role. *Heller v. Doe*, 509 U.S. 312, 319 (1993) (citation omitted). The judiciary is not authorized "'[to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Id.* (alteration in original; citation omitted). "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Id.* It is undisputed here that Act 10 did not involve fundamental rights or a suspect class, and the Legislature's "classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *See id.* at 320. And, as *Heller* instructs, "a legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification.'" *Id.* (citation omitted). Instead, the law requires courts to "'uph[o]ld [a classification] against [an] equal protection challenge if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (emphasis added; citation omitted).

¶51 The proper standard looks to whether there is *any* rational basis for the Legislature's classification of public safety employees here. *See id.* As relevant to the issues presented here, the Seventh Circuit has already answered this question in the affirmative, and although not binding, we agree with its analysis. We therefore conclude the circuit court erred in declaring Act 10 and Act 55 unconstitutional and striking provisions of those Acts as it had no legal basis upon

which to do so. Accordingly, we reverse the judgment and declare these statutes do not violate the equal protection guarantees of the Wisconsin Constitution.[18] The Legislature had a rational basis for enacting this legislation, for creating the two categories discussed herein, and for placing only certain public safety employees into Act 10's public safety group. Courts must respect both precedent and our role in deferring to the Legislature's fiscal policy decisions. On remand, the circuit court is instructed to vacate both the order granting Respondents' motion for judgment on the pleadings and the order denying Appellants' motion to dismiss; and the circuit court is directed to enter a judgment dismissing this action.

*By the Court.*—Judgment reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[18] Because we resolve this case on the merits, it is not necessary to address any alternate arguments raised (i.e., laches). *See, e.g.*, **Lickes**, 397 Wis. 2d 586, ¶33 n.10 ("Issues that are not dispositive need not be addressed." (quoted source omitted)); **Martinez**, 408 Wis. 2d 503, ¶5 (stating that this court decides cases on the narrowest possible grounds).

¶52   GROGAN, J. (*concurring*).   I join the Majority opinion in full, but write separately to make a final observation to address the obvious: The timing of this lawsuit is, to say the least, suspect.   In a seeming attempt to subvert the Seventh Circuit's clear rejection of an essentially identical equal protection argument under the federal constitution made over twelve years ago, the Unions claim here that the Wisconsin Constitution offers a different, greater equal protection than that of the United States Constitution despite clear Wisconsin Supreme Court cases unequivocally stating it does not.   *See, e.g.*, ***Madison Teachers, Inc. v. Walker (Madison Teachers)***, 2014 WI 99, ¶74 n.19, 358 Wis. 2d 1, 851 N.W.2d 337 ("In our analysis of the plaintiffs' equal protection claims, we treat the rights protected under the Wisconsin and United States Constitutions as coextensive."); ***Kohn v. Darlington Cmty. Schs.***, 2005 WI 99, ¶44 n.9, 283 Wis. 2d 1, 698 N.W.2d 794 ("This court has long held that '[w]e have given the equal-protection provision of the Wisconsin Constitution and the parallel clause of the United States Constitution identical interpretation.'" (alteration in original)); ***Aicher v. Wisconsin Patients Comp. Fund***, 2000 WI 98, ¶55 n.14, 237 Wis. 2d 99, 613 N.W.2d 849 ("We apply the same interpretation to the equal protection provisions of both the Wisconsin Constitution and the federal constitution."); ***State v. McManus***, 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989) ("[T]he … equal protection clause[] of the Wisconsin Constitution [is] the substantial equivalent[] of [its] respective clause[] in the federal constitution." (citing ***State ex rel. Cresci v. Schmidt***, 62 Wis. 2d 400, 414, 215 N.W.2d 361 (1974)); *see also* ***State ex rel. Sonneborn v. Sylvester***, 26 Wis. 2d 43, 50, 132 N.W.2d 249 (1965) (citing ***Boden v. City of Milwaukee***, 8 Wis. 2d 318, 99

N.W.2d 156 (1959)); ***Lathrop v. Donohue***, 10 Wis. 2d 230, 235, 102 N.W.2d 404 (1960); and ***Haase v. Sawicki***, 20 Wis. 2d 308, 311 n.2, 121 N.W.2d 876 (1963) (all reaffirming that the Wisconsin Constitution's equal protection clause is coextensive with that of the federal constitution).

¶53 Renewed attempts to attack Act 10 on already-rejected bases simply because the composition of our supreme court has changed must be rejected. A law's constitutionality does not ebb and flow with a court's composition, and the judicial branch must not be used to advance political agendas on either side of the political spectrum. However, in seeking to unwind legislation that both the federal court and the Wisconsin Supreme Court have upheld as constitutional for over a decade, this lawsuit seeks to do exactly that. At this juncture, if the People want to overturn these decisions, they must do so through the legislative branch, which, unlike the judicial branch, is necessarily political. The judicial branch, however— despite some parties' efforts to the contrary—is not and should not be a political branch, and independent jurists faithful to our Oaths must reject the politicization of our courts. As Justice Crooks wisely cautioned in his ***Madison Teachers*** concurrence:

> [T]he question before us in this case is not whether the [challenged statute] is good policy, not whether it accomplishes what it sets out to do, and *not whether it is unfair under some circumstances to some individuals*. The question before us in this case is solely this: starting with a presumption of constitutionality in its favor, are we persuaded beyond a reasonable doubt that the statute violates the Wisconsin Constitution in every circumstance?

***Madison Teachers***, 358 Wis. 2d 1, ¶168 (Crooks, J., concurring) (second alteration in original; emphasis added). I respectfully concur.

No. 2024AP2429(D)

¶54 NEUBAUER, J. (*dissenting*). I write in dissent because the challenged provisions of 2011 Wis. Act 10 ("Act 10") and 2015 Wis. Act 55 ("Act 55")[1] are unconstitutional. Article I, section 1 of the Wisconsin Constitution guarantees all people in Wisconsin the equal protection of the laws. A statutory classification is unconstitutional under the equal protection clause where "the legislature has made an irrational or arbitrary classification, one that has no reasonable purpose or relationship to the facts or a proper state policy." *Metropolitan Assocs. v. City of Milwaukee*, 2011 WI 20, ¶61, 332 Wis. 2d 85, 796 N.W.2d 717 (citation omitted).

¶55 The circuit court correctly determined that allowing some public safety employees to retain collective bargaining rights while excluding others violated the equal protection guaranty of the Wisconsin Constitution. The court stated: "The equal protection defect lies in the selective exclusion of certain employees that should be, but inexplicably are not, in the public safety group." Among other distinctions, there is no rational basis for excluding Capitol police, university police, state fire fighters, prison correctional officers, and conservation wardens from the public safety group.[2]

---

[1] Act 10 was passed in 2011. 2015 Wis. Act 55 pertains to initial union certification. As do the majority and the parties, I refer to Act 10 and Act 55's collective bargaining provisions collectively as being made by "Act 10."

[2] Our review on a constitutional challenge presents a question of law we review de novo. *Metropolitan Assocs. v. City of Milwaukee*, 2011 WI 20, ¶21, 332 Wis. 2d 85, 796 N.W.2d 717.

¶56     As set forth below, I first discuss Act 10's different treatment of public sector employees and then the two categories of employees engaged in public safety established under Act 10.  Next, I analyze the two categories under the well-established five-factor test our Wisconsin Supreme Court applies to equal protection challenges.

*A.  The Act 10 Public Employee Distinctions.*

*1. Act 10 Virtually Eliminates the Collective Bargaining Rights of One Category of Public Sector Employees.*

¶57     In 1959, Wisconsin became the first state to pass comprehensive labor relations laws for public-sector employees.  The Municipal Employment Relations Act ("MERA"), WIS. STAT. §§ 111.70–111.77 (2023-24),[3] closely followed by the State Employment Labor Relations Act ("SELRA"), WIS. STAT. §§ 111.81-111.94, created a generally applicable framework by which municipal and state employees could join together to form labor unions and collectively bargain with their employers.  Under that framework, a unit of employees could seek union representation by majority vote.  Secs. 111.70(4)(d)1., 111.83(1), (3)(b) (2009–10).  A union had the right to bargain in good faith over economic and non-economic terms and conditions of employment, including wages, health insurance and pension benefits, and procedures for resolving employment-related disputes.  Secs. 111.70(1)(a), 111.81(1), 111.84(1)(d), 111.91 (2009–10).  A union could not lose its certification unless 30 percent of the represented bargaining unit first petitioned for a decertification election, and then, in such an election, a majority of voters favored decertification.  *See* § 111.83(6) (2009–10).

---

[3] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

¶58    Act 10 left these collective bargaining rights in place for a group called "public safety" employees, while taking them away from a group called "general" employees. *See* WIS. STAT. §§ 111.70(1)(fm), (mm); 111.81(9g), (15r).

¶59    For the "general" employees, Act 10 prohibits bargaining on any subject except for base wages and capped base wages by consumer price index increases.    WIS. STAT. §§ 111.70(1)(a), 111.70(4)(mb), 111.81(1), 111.91(3). Unions representing "public safety" employees remain free to bargain over substantially all pre-Act 10 terms and conditions of employment, economic and non-economic.  Where a contract is reached on the single base wage subject for "general" employees, the term is limited to one year; for "public safety" employees, the terms may be extended.   *See* § 111.70(4)(cm)8m., WIS. STAT. § 111.92(3)(b).

¶60    In the public sector, all employees were, and still are, prohibited from going on strike, and thus, arbitration was put into place to resolve disputes. *See* WIS. STAT. §§ 111.70(4)(L), 111.89 (2009-10).  Pursuant to Act 10, arbitration is eliminated for "general" employees.   2011 Wis. Act 10 § 237 (repealing § 111.70(4)(cm)5.-8. (2009-10)).  Thus, Act 10 allows employers to unilaterally implement their bargaining proposals without the union's agreement—thereby giving employers total control over the single permitted subject of collective bargaining.  Unions of "public safety" employees may still invoke arbitration as to any employment terms when a deadlock exists.  *See* WIS. STAT. § 111.77(3).

¶61    Act 10 requires unions representing "general" employees to win annual recertification elections, and a "general" employee union must receive the support of 51 percent of all employees eligible to vote, rather than a majority of all voters.  WIS. STAT. §§ 111.70(4)(d)3.b., 111.83(3)(b).  The same rules apply to a

"general" employee union's attempt to obtain initial certification. Secs. 111.70(4)(d)1., 111.83(1).

¶62 Act 10 also prohibits public employers from deducting labor organization membership dues from "general" employees' paychecks. WIS. STAT. §§ 111.70(3g); 111.845. The Act prohibits public employers from covering any part of "general" employees' contribution to their pensions. WIS. STAT. § 40.05(1)(b)1. Act 10 also repealed public employers' minimum contribution requirement for "general" employees' health insurance premiums, capped employer contribution amounts, and eliminated collective bargaining over the same. *See* §§ 40.05(4)(ag); 111.70(4)(mc).

### 2. *Act 10 Provided Some Employees Engaged in Public Safety with Continued Collective Bargaining Rights, but Excluded Many Others.*

¶63 To create the "public safety" category, the Legislature used an existing list of municipal and state employees statutorily designated as "[p]rotective occupation participants" for purposes of the Wisconsin Retirement System ("WRS"). *See* WIS. STAT. § 40.02(48)(a) (2009-2010). Each of the 22 occupations at issue and designated under that statute "involve active law enforcement or active fire suppression or prevention" that expose the employee to a "high degree of danger or peril" and "require a high degree of physical conditioning." Sec. 40.02(48)(a)-(am) (2009-10).[4]

¶64 Seven of the twenty-two WRS "protective occupations" were included in Act 10's "[p]ublic safety employee" category. *See* WIS. STAT.

---

[4] WIS. STAT. § 40.02(48)(am) includes 23 job categories as of June 2024. "County jailer" was added by 2023 Wis. Act 4, § 3.

§§ 111.70(1)(mm); 111.81(15r). For police officers and fire fighters, the Legislature included municipal, but excluded state employees.

¶65 The list of "[p]ublic safety" employees who retained their collective bargaining rights includes: state traffic patrol officers, state motor vehicle inspectors, municipal police officers, municipal fire fighters, deputy sheriffs, county traffic police officers, and village employees who perform police and fire-protection services. *See* WIS. STAT. §§ 111.70(1)(mm); 111.81(15r).

¶66 The excluded employees who engage in public safety are: state police officers, state fire fighters, conservation wardens, conservation patrol boat captains, conservation patrol boat engineers, conservation pilots, conservation patrol officers, forest fire control assistants, sheriffs, undersheriffs, state probation and parole officers, state forest rangers, fire watchers employed at Wisconsin veterans' facilities, state correctional-psychiatric officers, excise tax investigators employed by the Department of Revenue, special criminal investigation agents in the Department of Justice, and assistant or deputy fire marshals. *See* WIS. STAT. § 40.02(48)(am) (2009–10).

¶67 It is a fact that, when these categories were created in 2011, members of every public employee union that endorsed Scott Walker's 2010 gubernatorial campaign were classified as "public safety" employees when Act 10 was passed ten months after the election. ***Wisconsin Educ. Ass'n Council v. Walker***, 824 F. Supp. 2d 856, 873 (W.D. Wis. 2012) (observing "that *none* of the public employee unions falling into the general category endorsed Walker in the 2010 election and that *all* of the unions that endorsed Walker fall within the public safety category"), *aff'd in part, rev'd in part*, 705 F.3d 640 (7th Cir. 2013).

5

*B. The Two Categories for Employees Engaged in Public Safety Are Not Rational.*

¶68 All parties agree that rational-basis review applies to determine whether Act 10's distinction between the public safety occupations that have been categorized as "public safety" employees and those public safety occupations whose employees have been categorized as "general" employees violates the Wisconsin equal protection guarantee.[5] *See **Madison Tchrs., Inc. v. Walker (Madison Teachers)***, 2014 WI 99, ¶74, 358 Wis. 2d 1, 851 N.W.2d 337.

¶69 As the Supreme Court has explained, "the test is not whether the legislature had a rationale" because "[the Legislature] will always have a rationale for anything it does." ***Milwaukee Brewers Baseball Club v. DHSS***, 130 Wis. 2d 79, 103, 387 N.W.2d 254 (1986). Rather,

> [t]he test is whether the rationale is rational. If the concept of equal protection is to be meaningful, equal protection cannot be interpreted so as to allow the legislature to exercise its will on a minority of citizens anytime it desires so long as there is any rationale to do so, regardless of how remote, fanciful, or speculative the rationale may be.

***Id.*** Accordingly, the Wisconsin Supreme Court has held that "a statute must meet five criteria in order to have a rational basis[.]" ***Metropolitan Assocs.***, 332 Wis. 2d 85, ¶64.

¶70 Those criteria are:

> (1) All classification[s] must be based upon substantial distinctions which make one class really different from another;

---

[5] The circuit court determined that "a rational basis exists for the distinction between most of the general employee group versus the public safety group." I agree that this distinction between the non-public safety employees and the public safety employees is not at issue here.

6

> (2) The classification adopted must be germane to the purpose of the law;
>
> (3) The classification must not be based upon existing circumstances only. [It must not be so constituted as to preclude addition to the numbers included within the class];
>
> (4) To whatever class a law may apply, it must apply equally to each member thereof; [and]
>
> (5) The characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

*Id.* (first and second alteration in original).

> 1. *The exclusion of some public safety employees from the "public safety" category is not based upon substantial distinctions which make one class really different from another.*

¶71    As to the first factor, the inclusion of some employees engaged in public safety in the protected category, and exclusion of others, is not based on any identified "substantial distinction" that makes the first group really different from the other. The lack of a substantial distinction is obvious, and it is alone fatal to the Legislature's position. It is an analysis that the majority fails to address altogether.[6]

¶72    The excluded occupations have been statutorily designated as involving "active law enforcement or active fire suppression or prevention," occupations that expose the employee to a "high degree of danger or peril" and "require[s] a high degree of physical conditioning." *See* WIS. STAT. § 40.02(48)(a) (2009-10). Capitol and university police, prison guards, state

---

[6] The majority simply declares that it does not see a reason to engage in the five-factor analysis. Majority, ¶47.

probation and parole officers, and special criminal investigation agents of the Wisconsin Department of Justice are all active law enforcement occupations: all perform traditional public-safety functions. DNR conservation wardens are credentialed law enforcement officers who make arrests. There is no substantial distinction that makes the public safety functions of municipal police officers inherently different from that of state police officers, or the fire prevention and suppression duties of municipal fire fighters inherently different from that of state fire fighters.

¶73 To pass constitutional muster, there must be something *inherently* different between the two groups whose members are all engaged in public safety—active law enforcement, fire suppression and prevention, and emergency services—dangerous jobs that require a high degree of conditioning. Employees who perform the same types of services and are putting themselves in harms way are being treated dramatically differently under the law.

¶74 Further attempts to identify a substantial distinction are unavailing. While the Legislature suggests that motor vehicle inspectors are included because they have law enforcement training, that applies equally to the excluded Capitol and university police. If motor vehicle inspectors are included because they have statewide jurisdiction, so do the excluded Capitol police and conservation wardens.[7] If University of Wisconsin (UW) police are excluded because their

---

[7] Conservation wardens have authority to make arrests related to their field of work (such as for dangerous use or transportation of weapons), to execute warrants and subpoenas, and are specifically authorized to make arrests for felonies committed in their presence and to work with other law enforcement agencies to make arrests for felony crimes. *See* WIS. STAT. § 29.921. Capitol police officers "may exercise the powers of a peace officer and the arrest powers of a law enforcement officer while located anywhere within this state." WIS. STAT. § 16.84(2).

jurisdiction is limited, that applies equally to many included small local police and village public safety employees. Having arrest power as a reason to include certain occupations applies equally to many of the excluded occupations.

¶75 The majority's failure to identify a substantial distinction between the two groups of included and excluded employees engaged in public safety—anything inherently different—is fatal to the Legislature's position. *See **Nankin v. Village of Shorewood***, 2001 WI 92, ¶41, 245 Wis. 2d 86, 630 N.W.2d 141 (explaining that the challenged statute violated equal protection because "[t]here is nothing inherent about populous counties to justify the classification in the statute that restricts the manner in which owners of property located in such counties may challenge their [tax] assessments"); ***Metropolitan Assocs.***, 332 Wis. 2d 85, ¶¶68-69 (explaining that the challenged statute violated equal protection because there was "nothing inherently different about taxpayers in [disfavored] opt out municipalities that would justify restricting the manner in which [they] may challenge their assessments" when compared with taxpayers in other municipalities who had full rights to challenge their assessments).

> 2. *The exclusion of some public safety employees from the "public safety" category is not germane to any asserted purpose of the law.*

¶76 Because there is nothing in the legislative record to provide any rationale for the two groups, it is incumbent upon the courts to attempt to identify a rationale that survives the equal protection analysis. ***Madison Teachers***, 358 Wis. 2d 1, ¶77 ("[W]e are obligated to locate or, in the alternative, construct a rationale that might have influenced the legislative determination" (citation omitted)).

¶77     The overall purpose of Act 10 was to create budget flexibility for public employers.  While the Legislature provided a rationale for distinguishing between non-safety public employees and public safety employees, it has failed to provide a purpose for carving out some public safety employees from the "public safety" group that is germane to the purpose of the law.  As the circuit court explained:

> The purpose of separating out the public safety group and maintaining their collective bargaining rights virtually unchanged was to preserve labor peace among employees deemed too vital to risk labor unrest with.  There are rational reasons to want to maintain additional benefits for police officers or fire fighters, as their jobs are highly dangerous and the need for recruiting and maintaining quality employees in these categories is significant and unique from many other, less or non-dangerous public positions.  The Legislature, however, needed to define the public safety group in a way that makes rational sense.

¶78     Including *all* public safety occupations is supported by this rationale.  Under Act 10, the excluded occupations also provide law enforcement, fire suppression or prevention, and emergency services.  These employees' jobs are just as germane to the purported purpose of preserving labor peace, and to the purpose of recruiting and maintaining quality employees.

¶79     As the circuit court aptly stated:

> These rationales explain why the [seven] categories of employees put in the public safety group are there.  It does not explain why the other employees who meet those same criteria are excluded from this public safety employee category.  For example, the Capitol and University of Wisconsin Police provide law enforcement just like local police and the State Patrol.  So, too, conservation wardens provide both law enforcement (the enforcement of State laws on state land, for example), and fire prevention and suppression.  This matches what police and firefighters do. ***These excluded employees perform the same types of work, suffer the same risks, and have the same sort of authority (such as to make arrests and enforce the laws),***

10

> *yet are placed into the general employee group with
> employees with whom they share no similarity*.

(Emphasis added).

¶80    To reiterate, if the "public safety" category was created to preserve labor peace and recruit and maintain quality employees in these dangerous and demanding occupations, that rationale applies *across the board*.

> *a. The Legislature's bare minimum hypothesis is speculative and
>    implausible.*

¶81    Recognizing this reality, the majority seizes upon the Legislature's newly found hypothesis that it sought to maximize budget flexibility for public employers, but carved out the minimum number of public safety occupations that would be necessary in the event of massive labor unrest following passage of Act 10 *combined* with an illegal strike or mass "sick out" by the excluded public safety employees following passage of Act 10.  *See* Majority, ¶¶42-44.  This "remote, fanciful, [and] speculative" hypothetical does not hold up either. *See Milwaukee Brewers*, 130 Wis. 2d at 103.

¶82    First, the specter of mass labor unrest *combined* with illegal strikes by the excluded public safety employees is not germane to a legitimate purpose.  It is illegal in Wisconsin for public employees to strike.  WIS. STAT. §§ 111.70(4)(L), 111.89.  Striking public employees incur daily penalties and forfeit their compensation, and their employers can terminate them with a bar on reinstatement.  Secs. 111.70(7m), 111.89(2).  Wisconsin law provides for relief in the courts for an injunction to terminate a strike.  Secs. 111.70(7m), 111.89.  Thus, an injunction and potential for contempt of court could also ensue.  WIS. STAT. § 785.04.

11

¶83 The hypothesized illegal strike by the excluded public safety employees is simply too remote and fanciful a basis to carve out some, but not other, public safety employees. This hypothetical requires layering speculation upon speculation to surmise that these excluded individuals, who have chosen to work in *occupations that seek to protect the public*, would chose to engage in illegal behavior with the loss of their jobs, costly penalties, and potential contempt of court consequences at stake. While hypothetical rationales can suffice, that is simply not the case here. It is completely speculative to suggest that Capitol and UW police, prison guards, and conservation wardens—individuals who have chosen to serve the public, but also, to specifically ensure public safety—would engage in such imaginary behavior. It lacks any basis in fact. That nothing like it *ever happened* speaks volumes.

¶84 As the United States Supreme Court explained in **United States Dep't of Agric. v. Moreno**, where a law already bars the conduct at issue, another law duplicating that bar is not rationally intended to prevent that same conduct. 413 U.S. 528, 536-37 ("The existence of [provisions to prevent food stamp fraud] necessarily casts considerable doubt upon the proposition that the [later] amendment could rationally have been intended to prevent those very same abuses.") The Legislature's hypothesis is built on the notion that it had to protect against what was already illegal behavior by 22 occupations of public safety employees, and that anticipated dystopian moment in time justified placing them into a disfavored group in perpetuity.

> b. *The Legislature's cost-savings purpose alone cannot satisfy the equal protection five-factor analysis: the classification must be rational.*

¶85 Again, even under the Legislature's made-up bare minimum hypothesis, the choice of who to include and who to exclude must meet the five-

12

factor test, including that there must be a substantial distinction between the two groups, and the exclusions must be germane to the purpose of the law. The cost-savings purpose alone cannot satisfy the equal protection five-factor analysis. The classifications must be rational. *See Funk v. Wollin Silo & Equip., Inc.*, 148 Wis. 2d 59, 69 n.6, 435 N.W.2d 244 (1989) ("[I]t is the classification that must be reasonable, not merely the general purpose or policy of the statute.").

¶86 As the Plaintiffs-Respondents soundly argue, "[j]ust as a cost-savings rationale could not justify cutting the salaries of only those state employees with last names beginning with A through L," the bare minimum hypothesis cannot justify the classification creating two groups by arbitrarily picking who is included and who is excluded among similarly situated employees. *See GTE Sprint Commc'ns Corp. v. Wisconsin Bell, Inc.*, 155 Wis. 2d 184, 192, 196, 454 N.W.2d 797 (1990) (holding that the challenged tax violated equal protection because the "purpose of the tax, to generate revenue, is ill served ... by imposing the tax only on [purchases by certain telecommunication carriers], when local exchange carriers and resellers make the same purchase"). Other cases make equally clear that increasing government revenue or decreasing government expenditures alone cannot justify classifications which fail to meet the five-factor rational basis test. *See, e.g.*, *Metropolitan Assocs*., 332 Wis. 2d 85; *Nankin*, 245 Wis. 2d 86.

¶87 The Legislature asserts that the protected group reflects a legislative judgment about the minimum number of: (1) state law-enforcement personnel with statewide jurisdiction and (2) arrest authority, and (3) local fire and law-enforcement personnel. However, as discussed above, it is apparent that the choice of who is in and who is out under the bare minimum hypothesis is equally arbitrary and irrational.

¶88 As to the first winnowing criteria—state law-enforcement personnel with statewide jurisdiction—this applies equally to the included motor vehicle inspectors and the excluded Capitol police and conservation wardens. *See* WIS. STAT. §§ 16.84(2), 23.11(4). This "distinction" between the included and excluded cannot explain the favored treatment of similarly situated employees.

¶89 Arrest authority does not distinguish the group because the excluded Capitol and UW police have the same arrest authority as the included state traffic patrol officers and local police. *Compare* WIS. STAT. §§ 16.84(2) (Capitol police), 36.11(2) (UW police), with WIS. STAT. §§ 110.07(2m) (state traffic patrol), 968.07 (arrest by a law enforcement officer). Again, this criterion does not explain the different treatment between the two groups.

¶90 Aside from the failure of the Legislature's attempts to distinguish these occupations, the inclusion of state motor vehicle inspectors and exclusion of Capitol police is clearly not germane to the purpose of ensuring public safety during a mass illegal labor strike—the Capitol police are *the* law enforcement officers statutorily responsible for ensuring the continuity of government and protecting legislative and executive officials, justices and judges, and state employees. *See* WIS. STAT. § 16.84(2).

¶91 Moreover, any mass labor unrest would undoubtedly take place in Madison, and yet the Capitol and university police are excluded, while state motor vehicle inspectors are included. State motor vehicle inspectors—a group of approximately 100 employees—"may not wear the uniform of the state patrol" and their "duties shall be to enforce and assist in administering" certain vehicle and traffic-related laws and "inspection requirements." WIS. STAT. § 110.07(3). If public safety is the stated purpose, it would be irrational to exclude the very law

enforcement officials we would need to protect our elected officials in the event of mass labor unrest.

¶92 The stated purpose of ensuring public safety in the event of mass labor unrest and strikes by the excluded public safety employees also does not explain the inclusion of *all* local and village police forces across the state—no matter where located or how small some of those forces might be. The argument that these local forces will be necessary to maintain public safety in the dozens of remote rural counties across the state, and yet exclude Capitol and UW police, underscores how fanciful and speculative the Legislature's stated purpose is.

¶93 Likewise, that same bare minimum hypothetical would surely require that state correctional officers working in the prison system be in the "public safety" group. That the state would forego the services of 4,500 prison guards *makes no sense.* As the circuit court reasoned, "[i]f the need to apprehend criminals is so great as to treat law enforcement differently, surely the same rational[e] applies to treat the prison staff equally to ensure that those convicted of crimes stay incarcerated." The Legislature's suggestion that the Wisconsin National Guard could simply replace all the state's prison guards because it did so in 1977—when the state's prison population was 18.7% of what it was in the beginning of 2011 (when there were over 20,0000 inmates)—is the epitome of a "fanciful" rationale that cannot satisfy rational-basis review.[8] *See Milwaukee Brewers*, 130 Wis. 2d at 103. The exclusion of prison guards *alone* underscores

---

[8] *Compare* 1978 Calendar Year Summary of Population Movement, Wis. Div. of Corr. 2, https://www.ojp.gov/pdffiles1/Digitization/66736NCJRS.pdf (reporting an average daily incarcerated population of 4,080 in 1977), with Prison Point-in-Time Populations Dashboards, Wis. Dep't of Corr., https://doc.wi.gov/Pages/DataResearch/PrisonPointInTime.aspx (last visited July 13, 2026) (reporting a total incarcerated population of 21,829 on Dec. 31, 2010).

that the Legislature's hypothesis is wholly irrational: excluding these employees is not germane to the stated purpose of ensuring public safety.

¶94 The inclusion of local fire fighters and exclusion of state fire fighters in the "public safety" group, also fails to hew to a germane purpose. The Legislature contends this distinction was drawn to "prioritize[] *emergency* fire services[.]" If so, it would be irrational and arbitrary to exclude those who help prevent fires at veterans' facilities and those who control forest fires, *see* WIS. STAT. § 40.02(am)6., 17.—occupations that provide emergency services.

¶95 Excluding the state fire marshal service in the event of mass labor unrest would leave crimes as serious as arson unresolved, a consequence that is clearly not germane to the purpose of ensuring public safety. *See* WIS. STAT. § 165.55 (stating that a fire that "may be of incendiary origin" should be reported to the state fire marshal).

¶96 As a last-ditch suggestion, the Legislature tries to paper over these obvious problems with its mass labor unrest and strike hypothetical with a suggestion that the included public safety employees would and could pinch hit for others. This too is remote, fanciful, and speculative. First, the suggestion that, at a time of mass labor unrest, the protected employees could feasibly be swapped in for the striking employees on an emergency basis for jobs with specific training and specific responsibilities strains credulity. The suggestion fails to recognize the statutory and jurisdictional limitations of the various positions. The suggestion also fails to explain how this subset of public safety employees could continue to competently perform their own duties at a time of massive social unrest following passage of Act 10, involving a strike by the "general" employees joined in by the

employees in 22 public safety occupations. Frankly, this pinch-hit hypothesis is preposterous.

¶97 To look more closely at the pinch-hit hypothesis, there is no suggested feasible replacement for the Capitol or UW police, employees with specific job training and statutorily assigned responsibilities unique to their positions. The Legislature suggests that state traffic patrol officers and motor vehicle inspectors—the only other included occupations in the "public safety" group with statewide jurisdiction and arrest authority—could also assume the specialized duties of the Capitol police and that of conservation wardens. However, the state traffic patrol's "primary duty" is to enforce "law[s] relating to the use or operation of vehicles upon the highway." WIS. STAT. § 110.07(2m). As noted above, the statutory responsibilities of the state traffic inspectors do not include those assigned to the Capitol police. And there is no realistic pinch-hit alternative offered for state traffic patrol officers and state traffic inspectors to then also safeguard 1.6 million acres of DNR-managed lands, as conservation wardens do.

¶98 Likewise, there is no realistic replacement for the 4,500 state prison guards. And, there is no realistic replacement for the state fire marshal.

¶99 Moreover, if employees in the protected group could so readily cover their own jobs and those of others, why would the reverse not be true? Why would Capitol and UW police not be included and state traffic inspectors excluded? Why would undersheriffs and sheriffs not be included, instead of

17

deputy sheriffs?[9]  While one could go on and on, even the most cursory analysis makes it clear that this unsupported and unfounded hypothetical of turning to the included employees to cover for the jobs of the illegally striking excluded employees at a time of massive social and labor unrest is utterly unrealistic.  The classifications made under the bare minimum pinch-hit hypothesis are irrational.  No emergency strategic planning would even begin to contemplate such a scenario because it is *completely implausible*.[10]

¶100  Where the classification does not serve the State's asserted interest in enacting the law, the classification cannot satisfy the second step of the rational-basis test.  *See* ***Milwaukee Brewers***, 130 Wis. 2d at 101 (stating that a classification is irrational where a "truncated set of environmental and judicial review rules" for prison construction only in one part of the state did not serve legitimate interest in "critical statewide need for prison space"); ***GTE Sprint***, 155 Wis. 2d 184, 196-98 (holding that arbitrarily imposing a tax on one group and not on similarly situated groups cannot be justified by the stated purpose of generating revenue).

---

[9] The only identifiable rationale that is rational for the carve out of the excluded public safety employees is that it included those who were members of public employee unions who endorsed Scott Walker's 2010 gubernatorial campaign.  While the political rationale is not grounds to invalidate Act 10, this foundational fact explains why the choices made under a bare minimum pinch-hit hypothesis simply cannot be contorted to meet the substantial distinction requirement or show that the classifications are germane to the purpose of the law.

[10] The record is devoid of any indication that preparations were made for this eventuality—plans to deploy others in public safety to cover for the anticipated illegal strike by excluded public safety employees.  Imagining how all would do their own jobs and effectively and efficiently pinch hit to also do others' jobs and protect the public absent any such preparations makes it clear that the bare minimum pinch-hit hypothesis is a fantasy.

¶101 While "[a] legislative classification is presumed to be constitutional[,]" *Milwaukee Brewers*, 130 Wis. 2d at 98, rational-basis review is not a rubber stamp. Adopting the Legislature's bare minimum pinch-hit hypothesis, which lacks any foundation in reality, is a rubber stamp.

3. *The characteristics of each class are not so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.*

¶102 As discussed above, the characteristics of the group of included and excluded occupations should be so far different as to suggest the propriety, as to the public good, of treating the two classes differently. This "[fifth] factor is based on" the long-held principle that "[t]he true practical limitation of the legislative power to classify is that the classification shall be based upon some apparent natural reason,—some reason suggested by necessity" to justify the "propriety of different legislation with respect to them." *Nankin*, 245 Wis. 2d 86, ¶43 (citation omitted). As demonstrated at length above, there is no such apparent reason or necessity for the inclusion of some and exclusion of others, creating two categories of similarly situated public safety employees.[11]

---

[11] I need not address the third and fourth factors, as the failure to meet each of these three is fatal to the constitutionality of Act 10.

19

*C. The Decisions in **Madison Teachers** and **WEAC** Are Not Controlling.*

¶103   The decisions in **Madison Teachers** and **Wisconsin Educ. Ass'n Council v. Walker**, 705 F.3d 640 (7th Cir. 2013) (**WEAC**) are not controlling.[12]

¶104   **Madison Teachers** focused *solely* on a distinction between two subgroups of "general" employees: "general" employees who are not represented by a certified union and "general" employees who are.  358 Wis. 2d 1, ¶74.  In considering that distinction, the Wisconsin Supreme Court held that Act 10's creation of "two classes of public employees by whether they elect to have a certified representative for collective bargaining purposes denies no employee equal protection under the law." *Id.*, ¶81.  The court expressly reserved judgment on the classification between "public safety" and "general" employees because it was "not at issue" in the case. *Id.*, ¶4 n.4.

¶105   The majority points to **Madison Teachers**' discussion of cost savings in support of its bare minimum pinch-hit hypothetical, however, as discussed at length above, that purpose alone cannot satisfy the equal protection five-factor analysis.  The classification must be rational.

¶106   The United States Court of Appeals for the Seventh Circuit's **WEAC** decision is also not controlling.  While the court did address the classification at issue in this case, the court only applied federal law.  705 F.3d at 642.  The decision is not binding on a Wisconsin court's interpretation of the equal

---

[12] Before the circuit court, the Legislature argued that the Plaintiffs' claims were precluded by **Madison Teachers, Inc. v. Walker (Madison Teachers)**, 2014 WI 99, 358 Wis. 2d 1, 851 N.W.2d 337, and **Wisconsin Educ. Ass'n Council v. Walker**, 705 F.3d 640 (7th Cir. 2013) under the claim preclusion doctrine.  They have abandoned that argument on appeal, substituting it with the bare minimum pinch-hit hypothetical.

protection guarantee in the *Wisconsin* Constitution. Indeed, even where, unlike here, a federal decision provides persuasive authority for interpreting *Wisconsin* law, Wisconsin courts are not obligated to follow it. *See, e.g.*, ***Daanen & Janssen, Inc. v. Cedarapids, Inc.***, 216 Wis. 2d 395, 400, 573 N.W.2d 842 (1998) ("This court is not bound by a federal court's interpretation of Wisconsin law."); ***Water Quality Store, LLC v. Dynasty Spas, Inc.***, 2010 WI App 112, ¶¶17-18, 328 Wis. 2d 717, 789 N.W.2d 595 (declining to follow Seventh Circuit analysis that conflicted with Wisconsin Supreme Court precedent).

¶107 While the Wisconsin Supreme Court has treated the state equal protection guarantee as "substantially equivalent" to its federal counterpart in the Fourteenth Amendment, ***Madison Teachers***, 358 Wis. 2d 1, ¶74 n.19 (citation omitted), the court has "repeatedly declared that it is [Wisconsin courts'] duty to interpret our constitution independently of the United States Constitution." ***A.M.B. v. Circuit Ct. for Ashland Cnty.***, 2024 WI 18, ¶51, 411 Wis. 2d 389, 5 N.W.3d 238 (Dallet, J., concurring). As detailed above, Wisconsin has a well-established five-factor test to be applied to the equal protection clause under the Wisconsin constitution. The Seventh Circuit's failure to apply this test, which *requires* a showing of: (1) substantial distinctions, (2) that the distinctions are germane to a legitimate purpose, and (3) that the characteristics of the two classes

are so far different as to show the propriety of the law, makes clear that *WEAC* should not be relied upon as persuasive authority.[13]

### D. The Circuit Court Did Not Err in Denying Laches.

¶108 The circuit court correctly relied upon *Clarke v. Wisconsin Elections Comm'n*, 2023 WI 79, 410 Wis. 2d 1, 998 N.W.2d 370, when it held that laches did not bar Plaintiffs-Respondents' substantive constitutional claim. In *Clarke*, the supreme court held that laches did not apply to the substantive constitutional challenge because the "overriding responsibility" of Wisconsin courts is "to the Wisconsin Constitution ... no matter how late it may be that a violation of the Constitution is found to exist." *Id.*, ¶42 (citation omitted). Were the law otherwise, unconstitutional discrimination could endure in perpetuity. *See also Nankin*, 245 Wis. 2d 86, ¶50 (enjoining a statute on equal protection grounds 46 years after its enactment). That rationale does not apply to challenges to process. *See Wisconsin Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶17 n.8, 393 Wis. 2d 308, 946 N.W.2d 101 (distinguishing authority rejecting laches

---

[13] While the supreme court has sometimes upheld statutes against equal protection challenges without considering the five-factor test, it has generally done so where "a rational basis is clearly present ... and proceeding through a five-factor test to confirm that fact is unnecessary." *Lands' End, Inc. v. City of Dodgeville*, 2016 WI 64, ¶181 n.17, 370 Wis. 2d 500, 881 N.W.2d 702 (Ziegler, J., concurring); *see also, e.g.*, *A.M.B. v. Circuit Court for Ashland County*, 2024 WI 18, ¶33, 411 Wis. 2d 389, 5 N.W.3d 238 (unanimously holding that the classification was supported by a rational basis). Alternatively, the court has not applied the test where the parties did not ask the court to apply the test, as in the *Madison Teachers* case. *See* Brief of Plaintiffs-Respondents at 33-36, *Madison Teachers*, 358 Wis. 2d 1 (2013) (No. 2012AP2067), 2013 WL 4552731 (arguing only that Act 10's classification between represented and non-represented "general" employees was subject to strict scrutiny and did not satisfy such scrutiny).

defense to substantive constitutional challenges because the challenge at issue attacked the process).[14]

## CONCLUSION

¶109 Our Wisconsin Supreme Court's directly applicable admonition bears repeating here:

> the test is not whether the legislature had a rationale. [The Legislature] will always have a rationale for anything it does. The test is whether the rationale is rational. If the concept of equal protection is to be meaningful, equal protection cannot be interpreted so as to allow the legislature to exercise its will on a minority of citizens anytime it desires so long as there is any rationale to do so, regardless of how remote, fanciful, or speculative the rationale may be.

*Milwaukee Brewers*, 130 Wis. 2d at 103. Accordingly, the Wisconsin Supreme Court stated that "a statute *must* meet five criteria in order to have a rational basis[.]" *Metropolitan Assocs.*, 332 Wis. 2d 85, ¶64 (emphasis added). The *requirement* to apply the five criteria so as to ensure that the rationale is rational is controlling. Here, the Legislature has exercised its will on a minority of citizens by making arbitrary and irrational distinctions between similarly situated employees engaged in the same types of work, with the same type of authority, and facing the same challenges and dangers as the included employees. The notion that all public safety employees who are excluded would be going on strike is utterly unrealistic, as is the suggestion that the included employees could pinch

---

[14] With the majority's reversal of the circuit court's ruling on the constitutional challenge, the remedy is not at issue in this case at this juncture. As such, I decline to review it. If the circuit court's constitutional ruling is upheld on review, the remedy will likely require careful review either on appeal or on remand, given the complex interconnectedness of the many statutes at issue and the significant passage of time.

hit for these striking employees. The circuit court did not err in determining that the challenged provisions of Act 10 unconstitutionally violated the equal protection guaranty set forth in Article I, section 1 of the Wisconsin Constitution.[15]

---

[15] I agree with all the parties that publication would be appropriate because the issues presented are of statewide importance. WIS. STAT. § (Rule) 809.23(1)(a)5.